# EXHIBIT A



# COVER PAGE

Please review each item listed below within this agreement and initial the cover page below to acknowledge accuracy.

|  | Candidate 1 | Candidate 2 |
|---|---|---|
| Legal Names spelled correct | MF | |
| Territories & zip codes are correct | MF | |
| Fees are correct | MF | |
| Is your address correct | MF | |
| Is your entity spelled correct (if applicable) | MF | |
| All Owners and Spouses listed (if applicable) | MF | |



# FRANCHISE AGREEMENT

| SUMMARY PAGE | |
|---|---|
| 1. **Franchisee** | Matthew S. Furman |
| 2. **Initial Franchise Fee** | $85,603.00 |
| 3. **Territory** | Territory 1: Colorado Springs, CO 3<br>Territory 2: Colorado Springs, CO 2<br>See Map and Zip Codes in Attachment 3 |
| 4. **Opening Deadline** | Six months after Effective Date |
| 5. **Principal Executive** | Matthew S. Furman |
| 6. **Franchisee's Address** | 2570 Brenton Drive, Colorado Springs, CO 80918 |

1

# FRANCHISE AGREEMENT

This Agreement is made between DonutNV Franchising, Inc., a Pennsylvania corporation ("DonutNV Franchising"), and Franchisee effective as of the date signed by DonutNV Franchising (the "Effective Date").

## Background Statement:

A.      DonutNV Franchising and its affiliate Keystone Amusements LLC have created and own a system (the "System") for developing and operating a mobile food service business under the trade name "DonutNV".

B.      The System includes (1) methods, procedures, and standards for developing and operating a DonutNV business, (2) menu items, beverages, products, and services, (3) the Marks, (4) training programs, (5) business knowledge, (6) marketing plans and concepts, and (7) other mandatory or optional elements as determined by DonutNV Franchising from time to time.

C.      The parties desire that DonutNV Franchising license the Marks and the System to Franchisee for Franchisee to develop and operate a DonutNV business on the terms and conditions of this Agreement.

## ARTICLE 1.  DEFINITIONS

"**Action**" means any action, suit, proceeding, claim, demand, governmental investigation, governmental inquiry, judgment or appeal thereof, whether formal or informal.

"**Approved Vendor**" means a supplier, vendor, or distributor of Inputs which has been approved by DonutNV Franchising.

"**Brand Fund**" means the fund established (or which may be established) by DonutNV Franchising into which Brand Fund Contributions are deposited.

"**Business**" means the DonutNV business owned by Franchisee and operated under this Agreement.

"**Competitor**" means (1) any business which offers food service by a food truck, trailer, or other mobile unit, or (2) any food service business specializing in donuts, whether mobile or from a fixed retail location.

"**Confidential Information**" means all non-public information of or about the System, DonutNV Franchising, and any DonutNV business, including all methods for developing and operating the Business, and all non-public plans, recipes, data, financial information, processes, vendor pricing, supply systems, marketing systems, formulas, techniques, designs, layouts, operating procedures, customer data, information, and know-how.

"**Input**" means any goods, services, supplies, fixtures, equipment, inventory, computer hardware and software, real estate, or comparable items related to establishing or operating the Business.

2

DocuSign Envelope ID: FF0DDC23-85E5-404B-B36D-BC73AF046434

"**Losses**" includes (but is not limited to) all losses; damages; fines; charges; expenses; lost profits; reasonable attorneys' fees; travel expenses, expert witness fees; court costs; settlement amounts; judgments; loss of DonutNV Franchising's reputation and goodwill; costs of or resulting from delays; financing; costs of advertising material and media time/space and the costs of changing, substituting or replacing the same; and any and all expenses of recall, refunds, compensation, public notices and other such amounts incurred in connection with the matters described.

"**Major Account**" means a local, regional, or national business which has multiple locations, which DonutNV Franchising expects will not be confined to the territory of a single franchisee, and which DonutNV Franchising designates as a "Major Account" pursuant to Section 7.7.

"**Manual**" means DonutNV Franchising's confidential Operations Manual(s), including any supplements, additions, or revisions from time to time, which may be in any form or media.

"**Marks**" means the trade name and logo contained on the Summary Page, and all other trade names, trademarks, service marks and logos specified by DonutNV Franchising from time to time for use in a DonutNV business.

"**Owner**" means each person or entity which directly or indirectly owns or controls any equity of Franchisee. If Franchisee is an individual person, then "Owner" means Franchisee.

"**Required Vendor**" means a supplier, vendor, or distributor of Inputs which DonutNV Franchising requires franchisees to use.

"**System Standards**" means, as of any given time, the then-current mandatory procedures, requirements, and/or standards of the System as determined by DonutNV Franchising, which may include without limitation, any procedures, requirements and/or standards for appearance, business metrics, cleanliness, customer service, data protection and privacy, design, equipment, inventory, maintenance, marketing and public relations, operating days, operating hours, presentation of Marks, product and service offerings (including menu and beverages), quality of products and services, recipes, reporting, safety, technology (such as computers, computer peripheral equipment, smartphones, point-of-sale systems, back-office systems, information management systems, security systems, video monitors, other software, backup and archiving systems, communications systems (including email, audio, and video systems), payment acceptance systems, and internet access, as well as upgrades, supplements, and modifications thereto), temporary operational changes due to special circumstances (such as a pandemic), types of events and locations that Franchisee may serve, uniforms, and Units.

"**Territory**" means the territory stated on the Summary Page.

"**Transfer**" means for Franchisee (or any Owner) to voluntarily or involuntarily transfer, sell, or dispose of, in any single or series of transactions, (i) substantially all of the assets of the Business, (ii) this Agreement, (iii) any direct or indirect ownership interest in the Business, or (iv) control of the Business.

3

"**Unit**" means a DonutNV food truck or any other vehicle, trailer, or other unit for serving DonutNV products.

### ARTICLE 2.   GRANT OF LICENSE

**2.1      Grant.** DonutNV Franchising grants to Franchisee the right to operate a DonutNV business solely in the Territory. Franchisee shall develop, open and operate a DonutNV business in the Territory for the entire term of this Agreement. Franchisee shall operate a single Unit. Franchisee does not have the right to operate additional Units in the Territory except as expressly described in Section 7.4.

**2.2      Protected Territory.**

(a)      Service. Franchisee shall primarily serve customers and events inside of the Territory. Franchisee may serve customers outside and events outside of the Territory so long as (A) Franchisee does not solicit, market to, or serve customers or events inside the territory of another DonutNV business, or (B) derive more than 10% of its annual revenue from customers and events outside the Territory. If Franchisee derives more than 10% of its annual revenue from such customers, DonutNV Franchising may require Franchisee to reduce such revenue to comply with this section, or require Franchisee to purchase additional territory (by amending this Agreement or signing a new franchise agreement, and acquiring a new DonutNV trailer to serve the additional territory). DonutNV may also pursue any other right or remedy for Franchisee's violation of this Agreement.

(b)      Protection. DonutNV Franchising shall not establish, nor license the establishment of, another mobile DonutNV business which serves customers and events located in the Territory. However, DonutNV Franchising retains the right to:

(i)      serve (or authorize other franchisees to serve) customers in the Territory if Franchisee is in default, or if Franchisee is incapable of meeting customer demand in the Territory (in DonutNV Franchising's reasonable opinion);

(ii)      open (and license others to open) fixed retail locations of "DonutNV" anywhere, including within the Territory.

(iii)      service an event or authorize another franchisee to service the event in the Territory, if DonutNV Franchising identifies an event opportunity within the Territory and informs Franchisee thereof, and if Franchisee does not elect within 24 hours to service the event;

(iv)      service (or authorize other franchisees to serve) Major Accounts in the Territory, if Franchisee declines to do so or is unable to do so on the terms and conditions set by DonutNV Franchising;

(v)      establish and license others to establish and operate DonutNV businesses outside the Territory;

4

(vi)     operate and license others to operate businesses anywhere that do not sell the same or similar goods or services under the same or similar trademarks or service marks as a DonutNV business; and

(vii)    sell and license others to sell DonutNV products and services to customers in the Territory through channels of distribution (including the internet) so long as such products and services are not provided through a DonutNV Unit.

(c)     Referrals. DonutNV Franchising may set policies binding on all franchisees regarding referral fees (and other terms and conditions) when a customer is referred from one DonutNV business to another. DonutNV Franchising may waive or modify such policies in any circumstance as DonutNV Franchising determines.

(d)     Change of Territory. DonutNV Franchising has no obligation to accept a request from Franchisee to change its Territory. If DonutNV Franchising does approve a request to change the Territory, it may impose conditions, including payment of a $3,000 fee and execution of a general release by Franchisee.

(e)     Violation of Territory. Franchisee shall not serve a customer or event inside the territory of another DonutNV operator (unless approved in writing by DonutNV Franchising). If Franchisee violates this prohibition, DonutNV Franchising may impose a fee equal $1,000 per day. This fee is a reasonable estimate of DonutNV Franchising's internal cost of personnel time attributable to addressing Franchisee's breach of this Section, and it is not a penalty or estimate of all damages arising from Franchisee's breach. This fee is in addition to all of DonutNV Franchising's other rights and remedies.

**2.3     Franchisee Control.** Franchisee represents that Attachment 1 (i) identifies each owner, officer and director of Franchisee, and (ii) describes the nature and extent of each owner's interest in Franchisee. If any information on Attachment 1 changes (which is not a Transfer), Franchisee shall notify DonutNV Franchising within 10 days.

**2.4     Principal Executive.** Franchisee agrees that the person designated as the "Principal Executive" on the Summary Page is the executive primarily responsible for the Business and has decision-making authority on behalf of Franchisee. The Principal Executive must have at least 50% ownership interest in Franchisee. The Principal Executive must participate in the direct operation of the Business and must devote substantial time and attention to the Business. If the Principal Executive dies, becomes incapacitated, transfers his/her interest in Franchisee, or otherwise ceases to be the executive primarily responsible for the Business, Franchisee shall promptly designate a new Principal Executive, subject to DonutNV Franchising's reasonable approval.

**2.5     Guaranty.** If Franchisee is an entity, then Franchisee shall have each Owner sign a personal guaranty of Franchisee's obligations to DonutNV Franchising, in the form of Attachment 2.

**2.6     No Conflict.** Franchisee represents to DonutNV Franchising that Franchisee and each of its Owners (i) are not violating any agreement (including any confidentiality or non-competition covenant) by entering into or performing under this Agreement, (ii) are not a direct or indirect

5

DonutNV Franchise Agreement

owner of any Competitor, and (iii) are not listed or "blocked" in connection with, and are not in violation under, any anti-terrorism law, regulation, or executive order.

## ARTICLE 3.   TERM

**3.1      Term.** This Agreement commences on the Effective Date and continues until the 10th anniversary of the first Tuesday which is 30 days after Franchisee takes delivery of its Unit.

**3.2      Successor Agreement.** When the term of this Agreement expires, Franchisee may enter into a successor agreement for one additional period of 10 years, subject to the following conditions prior to expiration:

(i)      Franchisee notifies DonutNV Franchising of the election to renew between 90 and 180 days prior to the end of the term;

(ii)      Franchisee (and its affiliates) are in compliance with this Agreement and all other agreements with DonutNV Franchising (or any of its affiliates) at the time of election and at the time of renewal;

(iii)      Franchisee has made or agrees to make (within a period of time acceptable to DonutNV Franchising) changes to the Business as DonutNV Franchising requires to conform to the then-current System Standards;

(iv)      Franchisee pays renewal fee equal to 25% of the then-current initial franchise fee (but not less than $10,000);

(v)      Franchisee and its Owners execute DonutNV Franchising's then-current standard form of franchise agreement and related documents (including personal guaranty), which may be materially different than this form (including, without limitation, higher and/or different fees), except that (A) Franchisee will not pay another initial franchise fee, (B) Franchisee will not receive additional renewal or successor terms, (C) if the Royalty Fee or any other fees varies by the year of operation or the year since execution, Franchisee's initial term will be counted towards such years, (D) the Territory will not be changed; and

(vi)      Franchisee and each Owner executes a general release (on DonutNV Franchising's then-standard form) of any and all claims against DonutNV Franchising, its affiliates, and their respective owners, officers, directors, agents and employees.

## ARTICLE 4.   FEES

**4.1      Initial Franchise Fee.** Upon signing this Agreement, Franchisee shall pay an initial franchise fee in the amount stated on the Summary Page. This initial franchise fee is not refundable under any circumstances.

6

**4.2    Royalty Fee.** Commencing on the first Tuesday which is 30 days after Franchisee takes delivery of its Unit, Franchisee shall pay DonutNV Franchising a weekly royalty fee (the "Royalty Fee") as follows:

      (i)      Year 1: $125 per week

      (ii)      Year 2: $136 per week

      (iii)      Year 3 through end of term: $146 per week

Year 1 begins 30 days after Franchisee takes delivery of its Unit. The Royalty Fee for any given week is due on the Tuesday of the following week.

**4.3    Brand Fund Contribution.** Commencing on the first Tuesday after the calendar month in which Franchisee takes delivery of its Unit, Franchisee shall pay DonutNV Franchising a contribution to the Brand Fund (the "Brand Fund Contribution") equal to $200 per month owned by Franchisee. The Brand Fund Contribution is due on the first Tuesday of each calendar month.

**4.4    Technology Fee.** Franchisee shall pay DonutNV Franchising a commercially-reasonable technology fee (the "Technology Fee") each month in exchange for software and other technology-related services and products provided by or through DonutNV Franchising. The Technology Fee does not have to be a pass-through of DonutNV Franchising's exact costs. DonutNV Franchising has no liability or obligation to Franchisee with respect any third-party software or other technology-related services and products that DonutNV Franchising provides to Franchisee. The Technology Fee is due and payable at the same time as the Brand Fund Contribution. DonutNV Franchising may add, remove, or alter the software or technology products or services that it provides. As of the date of this Agreement, the Technology Fee is $250 per month. DonutNV Franchising may increase the Technology Fee after 30 days' notice to Franchisee. The Technology Fee begins when DonutNV Franchising delivers a tablet to Franchisee.

**4.5    Additional Training Fee.**

      (a)      At DonutNV Franchising Location. If Franchisee sends an employee to DonutNV Franchising's training program after opening, DonutNV Franchising may charge its then-current training fee. As of the date of this Agreement, the fee for such training is $300 per day. Franchisee is responsible for all travel and other expenses of its personnel.

      (b)      At Franchisee's Location. If DonutNV Franchising provides additional training or other in-person support in response to Franchisee's request, DonutNV Franchising may charge its then-current fee plus any out-of-pocket expenses (such as travel, lodging, and meals for employees providing onsite support). At of the date of this Agreement, the fee for such training is $750 per day.

**4.6    Non-Compliance Fee.** DonutNV Franchising may charge Franchisee $250 for any instance of non-compliance with the System Standards or this Agreement (other than Franchisee's non-payment of a fee owed to DonutNV Franchising) which Franchisee fails to cure after 30 days' notice. Thereafter, DonutNV Franchising may charge Franchisee $250 per

week until Franchisee ceases such non-compliance. This fee is a reasonable estimate of DonutNV Franchising's internal cost of personnel time attributable to addressing the non-compliance, and it is not a penalty or estimate of all damages arising from Franchisee's breach. The non-compliance fee is in addition to all of DonutNV Franchising's other rights and remedies (including default and termination under Section 14.2).

**4.7    Third Party Vendors.** If DonutNV Franchising requires Franchisee to use a designated third-party vendor, DonutNV Franchising has the right (but not the obligation) to collect payment on behalf of the vendor and remit the payment to the vendor. If DonutNV Franchising does so, it may impose a markup or charge (not to exceed 20%) for administering the payment program.

**4.8    Reimbursement.** DonutNV Franchising may (but is never obligated to) pay on Franchisee's behalf any amount that Franchisee owes to a supplier or other third party. If DonutNV Franchising does so or intends to do so, Franchisee shall pay such amount plus a 10% administrative charge to DonutNV Franchising within 15 days after invoice by DonutNV Franchising accompanied by reasonable documentation.

**4.9    Inflation Adjustment.** DonutNV Franchising may increase the Royalty Fee, Brand Fund Contribution, and other fees due under this Agreement once per year, up to an amount equal to national inflation over the prior year (based on the Consumer Price Index published by the Bureau of Labor Statistics, or any successor index). DonutNV Franchising shall give at least 30 days prior notice (which may be delivered electronically to franchisee or via system-wide announcement, and need not qualify as "notice" under Section 18.9) before raising fees based on inflation.

**4.10    Payment Terms.**

(a)    Method of Payment. Franchisee shall pay the Royalty Fee, Brand Fund Contribution, Technology Fee, and any other amounts owed to DonutNV Franchising by pre-authorized bank draft or in such other manner as DonutNV Franchising may require. Franchisee shall comply with DonutNV Franchising's payment instructions.

(b)    Late Fees and Interest. If Franchisee does not make a payment on time, Franchisee shall pay a $25 "late fee" per day plus interest on the unpaid amount at a rate equal to 12% per year (or, if such payment and/or rate exceeds the maximum allowed by law, then payment and/or interest at the highest rate allowed by law).

(c)    Costs of Collection. Franchisee shall repay any costs incurred by DonutNV Franchising (including reasonable attorney fees) in attempting to collect payments owed by Franchisee.

(d)    Application. DonutNV Franchising may apply any payment received from Franchisee to any obligation and in any order as DonutNV Franchising may determine, regardless of any designation by Franchisee.

(e)    Obligations Independent; No Set-Off. The obligations of Franchisee to pay to DonutNV Franchising any fees or amounts described in this Agreement are not dependent on

8

DonutNV Franchise Agreement

DonutNV Franchising's performance and are independent covenants by Franchisee. Franchisee shall make all such payments without offset or deduction.

(f)    Taxes. Franchisee will be responsible for all sales taxes, use taxes, and other taxes imposed on the fees payable by Franchisee to DonutNV Franchising or its affiliates and on services or goods furnished to Franchisee by DonutNV Franchising or its affiliates, unless the tax is an income tax assessed on DonutNV Franchising or its affiliate for doing business in the state where the Business is located.

## ARTICLE 5.   ASSISTANCE

**5.1    Manual.** DonutNV Franchising shall make its Manual available to Franchisee on loan. Franchisee acknowledges that the Manual remains the sole property of DonutNV Franchising at all times. If Franchisee loses, gives away, makes unauthorized copies of, fails to return, or otherwise misappropriate all or some of the Manual, Franchisee shall pay a fee of $750 to DonutNV Franchising. This fee is a reasonable estimate of DonutNV Franchising's internal cost of personnel time attributable to addressing this loss, and is not a penalty or estimate of all damages arising from Franchisee's breach. This fee is in addition to all of DonutNV Franchising's other rights and remedies. Imposition of this fee does not waive any of DonutNV Franchising's rights of specific performance or injunctive relief.

**5.2    Pre-Opening Assistance.**

(a)    <u>Vehicle trailer, equipment, signage, and supplies</u>. DonutNV Franchising or its affiliate will sell to Franchisee the DonutNV vehicle trailer, outfitted with all equipment, signage, and substantially all supplies and inventory) needed to operate the Unit. DonutNV Franchising will transfer any warranties on the trailer and equipment to Franchisee. DonutNV disclaims any and all warranties regarding the trailer, equipment and other contents, including warranties of merchantability or fitness for a particular purpose. Franchisee is solely responsible for ensuring the Unit will comply with all applicable laws and regulations and will be able to obtain all applicable permits in Franchisee's jurisdiction. If Franchisee requests changes to the trailer in order to comply with applicable laws, regulations, or permitting requirements, such changes will be at Franchisee's sole expense. If Franchisee's jurisdiction does not permit the standard DonutNV donut machine, then DonutNV Franchising will substitute a different machine, and Franchisee will be responsible for any additional cost.

(b)    <u>Business Plan Review</u>. If requested by Franchisee, DonutNV Franchising shall review and advise on Franchisee's pre-opening business plan and financial projections. **Franchisee acknowledges that DonutNV Franchising accepts no responsibility for the performance of the Business.**

(c)    <u>Pre-Opening Training</u>. DonutNV Franchising shall make available its standard pre-opening training to the Principal Executive and up to one other employee, at DonutNV Franchising's headquarters and/or at another location designated by DonutNV Franchising. DonutNV Franchising shall not charge any fee for this training. Franchisee is responsible for its own travel, lodging, meal, and other out-of-pocket expenses. DonutNV Franchising reserves the

right to vary the length and content of the initial training program based on the experience and skill level of any individual attending the program.

(d)   <u>Market Introduction Plan</u>. DonutNV Franchising shall advise Franchisee regarding the planning and execution of Franchisee's market introduction plan.

(e)   <u>Bookkeeping Service</u>. If Franchisee engages DonutNV Franchising's recommended bookkeeping service prior the first anniversary of the Effective Date, DonutNV Franchising will pay Franchisee's costs of initial setup and service for three months (up to $300).

**5.3   Post-Opening Assistance.**

(a)   <u>Advice, Consulting, and Support</u>. If Franchisee requests, DonutNV Franchising will provide advice to Franchisee (by telephone or electronic communication) regarding improving and developing Franchisee's business, and resolving operating problems Franchisee encounters, to the extent DonutNV Franchising deems reasonable.

(b)   <u>Pricing</u>. Upon request, DonutNV Franchising will provide recommended prices for products and services offered by franchisees of the System.

(c)   <u>Procedures</u>. DonutNV Franchising will provide Franchisee with certain recommended administrative, bookkeeping, accounting, and/or inventory control procedures, to the extent DonutNV deems appropriate. DonutNV Franchising may make any such procedures part of required (and not merely recommended) System Standards.

(d)   <u>Marketing</u>. DonutNV Franchising shall manage the Brand Fund.

(e)   <u>Internet</u>. DonutNV Franchising shall maintain a website for DonutNV, which will include Franchisee's location (or territory) and a method for contacting Franchisee.

(f)   <u>Food Safety and Brands Standards Review</u>. DonutNV Franchising shall conduct a food safety and brand standards review at least once per calendar year. DonutNV Franchising may conduct more than one such review per year. DonutNV Franchising may engage a third party to conduct the review. DonutNV Franchising may charge a commercially-reasonable fee for the review. As of the date of this Agreement, the fee is $265. Franchisee shall correct any deficiencies found in the review as promptly as possible (and in no event later than 15 days after receiving the report of the review).

### ARTICLE 6.   LOCATION, DEVELOPMENT, AND OPENING

**6.1   Location.** Franchisee is solely responsible for selecting a suitable location for managing the Business and for storing the Unit.

**6.2   New Franchisee Training.** Franchisee's Principal Executive must complete DonutNV Franchising's training program for new franchisees. If the Principal Executive fails to complete the initial training program to DonutNV Franchising's satisfaction, then DonutNV may outline additional training or conditions that the Principal Executive must meet in order to satisfactorily complete the training prior to opening for business. If the Principal Executive fails to complete

10

DocuSign Envelope ID: FF8DDC23-85E5-404B-B36D-BC73AF046434

the additional training or conditions to the satisfaction of DonutNV Franchising, then DonutNV Franchising may terminate this Agreement without further opportunity to cure.

**6.3** **Conditions to Opening.** Franchisee shall notify DonutNV Franchising at least 30 days before Franchisee intends to open the Business. Before opening, Franchisee must satisfy all of the following conditions: (1) Franchisee is in compliance with this Agreement, (2) Franchisee has obtained all applicable governmental permits and authorizations, (3) the Business conforms to all applicable System Standards, (4) Franchisee has hired sufficient employees, (5) Franchisee's officers and employees have completed all of DonutNV Franchising's required pre-opening training; and (6) DonutNV Franchising has given its written approval to open, which will not be unreasonably withheld.

**6.4** **Opening Date.** Franchisee shall open the Business on or before the date stated on the Summary Page.

## ARTICLE 7.  OPERATIONS

**7.1** **Compliance with Manual and System Standards**. Franchisee shall at all times and at its own expense comply with all mandatory obligations contained in the Manual and with all other System Standards, as they are now or hereafter established. Franchisee acknowledges and agrees that the products and services offered under the Marks have a reputation for excellence and that Franchisee's compliance with all System Standards is of the utmost importance to DonutNV Franchising.

**7.2** **Compliance with Law.** Franchisee and the Business shall comply with all laws and regulations. Franchisee and the Business shall obtain and keep in force all governmental permits and licenses necessary for the Business.

**7.3** **Food Service.**

(a)    Menu. Franchisee shall offer all menu items and other products and services, and only those menu items, products and services, from time to time prescribed by DonutNV Franchising in the Manual or otherwise in writing.

(b)    Preparation. Franchisee shall follow all recipes prescribed by DonutNV Franchising, including, without limitation, use of all ingredients specified or authorized by DonutNV Franchising, and only such ingredients. Franchisee shall maintain sufficient levels of inventory at all times.

(c)    Locations and Events. DonutNV Franchising has the right designate (in the Manual or otherwise in writing) types of venues, locations, and events at which Franchisee shall not provide services.

(d)    Prices. Franchisee retains the right to determine prices it charges for menu items (subject to Section 7.7).

(e)    Delivery Services. Franchisee may use the third-party delivery services that DonutNV Franchising approves from time to time. DonutNV Franchising reserves the

11

right to negotiate system-wide agreements with third-party delivery services, and Franchisee shall comply with any such agreement. Franchisee shall be solely responsible for all charges imposed by a third-party delivery services.

(f)      Methods of Service. Franchisee shall make sales only from the Unit or as permitted under subsection (e) above. Franchisee shall not make sales by any other means, including without limitation over the internet or via mail order.

(g)      Dedicated Location. During the first 12 months after Franchisee commences operation, Franchisee cannot use a Unit to serve single location for more than 15 out of any 30 calendar days without prior written approval from DonutNV Franchising.

## 7.4    Additional Units.

(a)      Option to Acquire Additional Units. If Franchisee is not in default of under this Agreement and has not committed a default in the prior 12 months, and if Franchisee obtains prior approval from DonutNV Franchising (which will not be unreasonably withheld), then Franchisee may purchase one or more additional Units to operate in the Territory.

(b)      Requirement to Acquire Additional Units. If Franchisee uses a Unit to serve a single location for more than 25 out of any 30 consecutive days, DonutNV Franchising reserves the right to require Franchisee to purchase and deploy an additional Unit to in order to serve other venues in the Territory.

(c)      Terms and Documentation. To obtain and operate an additional Unit under this Section, Franchisee must execute a separate new Franchise Agreement for the additional Unit, after compliance with all disclosure and other legal obligations. Franchisee would not pay an additional initial franchise fee for the additional Unit, but Franchisee would pay all other fees for the additional Unit as specified in the new Franchise Agreement.

## 7.5    Personnel.

(a)      Management. If the Principal Executive delegates daily operations to a general manager, then the general manager must have successfully completed DonutNV Franchising's training program.

(b)      Service. Franchisee shall cause its personnel to render competent and courteous service to all customers and members of the public.

(c)      Appearance. Franchisee shall cause its personnel to comply with any dress attire, uniform, personal appearance, and hygiene standards set forth in the Manual.

(d)      Drivers. Franchisee shall ensure that all drivers of the Unit have a valid license to do so and meet any System Standards set by DonutNV Franchising.

(e)      Sole Responsibility. Franchisee is solely responsible for the terms and conditions of employment of all of its personnel, including recruiting, hiring, training, scheduling, supervising, compensation, and termination. Franchisee is solely responsible for all actions of its

12

personnel. Franchisee and DonutNV Franchising are not joint employers, and no employee of Franchisee will be an agent or employee of DonutNV Franchising.

**7.6    Post-Opening Training.** DonutNV Franchising may at any time require that the Principal Executive and/or any other employees complete training programs, in any format and in any location determined by DonutNV Franchising. DonutNV Franchising may charge a reasonable fee for any training programs. DonutNV Franchising may require Franchisee to provide training programs to its employees. If a training program is held at a location which requires travel by the Principal Executive or any other employee, then Franchisee shall pay all travel, living and other expenses.

**7.7    Major Accounts.** If DonutNV Franchising designates a customer or business as a Major Account, then DonutNV Franchising may set mandatory policies for serving such Major Account, including, without limitation, policies regarding prices and products, referral fees, qualifications to serve the accounts, and customer relationship management. DonutNV Franchising has sole discretion to determine whether any customer or business is a Major Account.

**7.8    Customer Complaints.** Franchisee shall use its best efforts to promptly resolve any customer complaints. DonutNV Franchising may take any action it deems appropriate to resolve a customer complaint regarding the Business, and DonutNV Franchising may require Franchisee to reimburse DonutNV Franchising for any expenses.

**7.9    Customer Evaluation and System Compliance Programs.** Franchisee shall participate at its own expense in programs required from time to time by DonutNV Franchising for obtaining customer evaluations and/or reviewing Franchisee's compliance with the System, which may include (but are not limited to) a customer feedback system, customer survey programs, and mystery shopping. DonutNV Franchising shall share with Franchisee the results of these programs, as they pertain to the Business. Franchisee must meet or exceed any minimum score requirements set by DonutNV Franchising for such programs. DonutNV Franchising may set minimum scores that Franchisee must receive from the public on internet review sites (such as Yelp or Google).

**7.10    Payment Systems.** Franchisee shall accept payment from customers in any form or manner designated by DonutNV Franchising (which may include, for example, cash, specific credit and/or debit cards, gift cards, electronic fund transfer systems, and mobile payment systems). Franchisee shall purchase or lease all equipment and enter into all business relationships necessary to accept payments as required by DonutNV Franchising. Franchisee must at all times comply with payment card industry data security standards (PCI-DSS).

**7.11    Gift Cards, Loyalty Programs, and Incentive Programs.** At its own expense, Franchisee shall sell or otherwise issue gift cards, certificates, or other pre-paid systems, and participate in any customer loyalty programs or customer incentive programs, designated by DonutNV Franchising, in the manner specified by DonutNV Franchising in the Manual or otherwise in writing. Franchisee shall honor all valid gift cards and other pre-paid systems, regardless of whether issued by Franchisee or another DonutNV business. If Franchisee honors a gift card or other pre-paid system sold by another location, or vice versa, DonutNV Franchising

DonutNV Franchise Agreement

and Franchisee will cooperate so that the cash received is fairly allocated to the location where that gift card or other pre-paid system is redeemed (subject to fees and charges). Franchisee shall comply with all procedures and specifications of DonutNV Franchising related to gift cards, certificates, and other pre-paid systems, or related to customer loyalty or customer incentive programs.

**7.12    Maintenance and Repair.** Franchisee shall maintain the Unit, equipment and other assets in good working condition and repair. Franchisee shall comply with any System Standards related to maintenance, repair, and replacement of the Unit, equipment and other assets.

**7.13    Unit.** Franchisee shall ensure that the Unit complies with all applicable System Standards, including without limitation required equipment and exterior décor. Franchisee shall keep the Unit clean and free of dents and other damage. Franchisee shall ensure that the Unit presents a first-class image appropriate to DonutNV Franchising's System. Franchisee shall refurbish, rewrap, and/or remodel the Unit from time to time as directed by DonutNV Franchising (and at must rewrap least once every five years) to meet its then-current brand image for new Units, at Franchisee's expense. Franchisee shall keep the Unit in secured storage when not in use. Franchisee shall use the Unit solely for the Business.

**7.14    Vehicles.** To tow the trailer Unit, Franchisee shall buy or lease a vehicle which complies with all applicable System Standards. The vehicle must not be more than seven years old. Franchisee shall keep the vehicle in excellent (or better) condition, clean, and free of dents and other damage, and shall ensure that the vehicles present a first-class image appropriate to the System. Franchisee shall not have any signage or décor on the vehicle other than approved DonutNV signage.

**7.15    Insurance.**

(a)    Franchisee shall obtain and maintain insurance policies in the types and amounts as specified by DonutNV Franchising in the Manual. If not specified in the Manual, Franchisee shall maintain at least the following insurance coverage:

(i)    commercial general liability insurance, including products liability coverage, and broad form commercial liability coverage, written on an "occurrence" policy form in an amount of not less than $1,000,000 single limit per occurrence and $2,000,000 aggregate limit;

(ii)    business automobile liability insurance including owned, leased, non-owned and hired automobiles coverage in an amount of not less than $1,000,000;

(iii)    employer practices insurance in an amount of not less than $1,000,000;

(iv)    workers compensation coverage as required by state law, but in no event less than $1,000,000; and

(v)    business interruption insurance (with a maximum deduction of $3,000) for a minimum of 90 days.

14

DonutNV Franchise Agreement

(b)    Franchisee's policies (other than Workers Compensation) must (1) list DonutNV Franchising and its affiliates as an additional insured, (2) include a waiver of subrogation in favor of DonutNV Franchising and its affiliates, (3) be primary and non-contributing with any insurance carried by DonutNV Franchising or its affiliates, and (4) the policies must stipulate that DonutNV Franchising shall receive 30 days' prior written notice of cancellation.

(c)    Franchisee shall provide Certificates of Insurance evidencing the required coverage to DonutNV Franchising prior to opening and upon annual renewal of the insurance coverage, as well as at any time within 15 days after request by DonutNV Franchising.

**7.16    Obligations to Third Parties.** Franchisee shall pay all vendors and suppliers in a timely manner. Franchisee shall pay all taxes when due. If Franchisee borrows money, it shall comply with the terms of its loan and make all loan payments when due.

**7.17    Public Relations.** Franchisee shall not make any public statements (including giving interviews or issuing press releases) regarding DonutNV, the Business, or any particular incident or occurrence related to the Business, without DonutNV Franchising's prior written approval which will not be unreasonably withheld.

**7.18    Association with Causes.** Franchisee shall not in the name of the Business (i) donate money, products, or services to any charitable, political, religious, or other organization or cause, or (ii) act in support of any such organization or cause, without DonutNV Franchising's prior written approval, which will not be unreasonably withheld.

**7.19    No Other Activity Associated with the Business.** Franchisee shall not use the assets of the Business for any purpose other than the Business. Franchisee shall not "co-brand" or associate any other business activity with the DonutNV Business in a manner which is likely to cause the public to perceive it to be related to the DonutNV Business. If Franchisee is an entity, the entity shall not own or operate any other business except DonutNV businesses.

**7.20    No Third-Party Management.** Franchisee shall not engage a third-party management company to manage or operate the Business without the prior written approval of DonutNV Franchising, which will not be unreasonably withheld.

**7.21    Identification.** Franchisee must identify itself as the independent owner of the Business in the manner prescribed by DonutNV Franchising.

**7.22    Meetings.** The Principal Executive shall use reasonable efforts to attend all in-person meetings and remote meetings (such as telephone and video conference calls) that DonutNV Franchising requires, including any national or regional brand conventions. Franchisee shall not permit the Principal Executive to fail to attend more than three consecutive required meetings.

**7.23    Business Practices.** Franchisee, in all interactions with customers, employees, vendors, governmental authorities, and other third parties, shall be honest and fair. Franchisee shall comply with any code of ethics or statement of values from DonutNV Franchising. Franchisee shall not take any action which injures or is likely to injure the goodwill associated with the Marks.

DonutNV Franchise Agreement

## ARTICLE 8. SUPPLIERS AND VENDORS

**8.1** **Generally.** Franchisee shall acquire all Inputs required by DonutNV Franchising from time to time in accordance with System Standards. DonutNV Franchising may require Franchisee to purchase or lease any Inputs from DonutNV Franchising, DonutNV Franchising's designee, Required Vendors, Approved Vendors, and/or under DonutNV Franchising's specifications. DonutNV Franchising may change any such requirement or change the status of any vendor. To make such requirement or change effective, DonutNV Franchising shall issue the appropriate System Standards.

**8.2** **Trailer, Equipment, and Inventory.** Without limiting the generality of Section 8.1, Franchisee acknowledges that DonutNV Franchising or its affiliate is the sole Required Vendor of (1) the Unit with the initial package of donut machines, refrigerated beverage dispensers, mixers, juicers, hot beverage machines, food containers, utensils, small wares, and donut mix, and (2) any additional or replacement donut machines. DonutNV Franchising and its affiliate have the right to earn a profit from any product supplied to Franchisee.

**8.3** **Alternate Vendor Approval.** If DonutNV Franchising requires Franchisee to purchase a particular Input only from an Approved Vendor or Required Vendor, and Franchisee desires to purchase the Input from another vendor, then Franchisee must submit a written request for approval and any information, specifications and/or samples requested by DonutNV Franchising. DonutNV Franchising may condition its approval on such criteria as DonutNV Franchising deems appropriate, which may include evaluations of the vendor's capacity, quality, financial stability, reputation, and reliability; inspections; product testing, and performance reviews. DonutNV Franchising will provide Franchisee with written notification of the approval or disapproval of any proposed new vendor within 30 days after receipt of Franchisee's request.

**8.4** **Alternate Input Approval.** If DonutNV Franchising requires Franchisee to purchase a particular Input, and Franchisee desires to purchase an alternate to the Input, then Franchisee must submit a written request for approval and any information, specifications and/or samples requested by DonutNV Franchising. DonutNV Franchising will provide Franchisee with written notification of the approval or disapproval of any proposed alternate Input within 30 days after receipt of Franchisee's request.

**8.5** **Purchasing.** DonutNV Franchising may implement a centralized purchasing system and negotiate prices and terms with vendors on behalf of the System. DonutNV Franchising may receive rebates or payments from vendors in connection with purchases by franchisees. DonutNV Franchising may establish a purchasing cooperative and require Franchisee to join and participate in the purchasing cooperative on such terms and conditions as DonutNV Franchising may determine.

**8.6** **No Liability of Franchisor.** Except as expressly provided in Section 8.7 for products supplied by DonutNV Franchising or its affiliates, DonutNV Franchising shall not have any liability to Franchisee for any claim or loss related to any product provided or service performed by any Approved Vendor or Required Vendor, including without limitation defects, delays, or unavailability of products or services.

16

DonutNV Franchise Agreement

**8.7    Warranties.**

(a)    DONUTNV FRANCHISING AND ITS AFFILIATES MAKE NO REPRESENTATION OR WARRANTY TO FRANCHISEE OR FRANCHISEE'S CUSTOMERS WITH RESPECT TO ANY PRODUCT SOLD BY DONUTNV FRANCHISING AND ITS AFFILIATES TO FRANCHISEE, AND SPECIFICALLY DISCLAIMS ANY AND ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY, QUALITY, PERFORMANCE, OR FITNESS FOR A PARTICULAR PURPOSE.

(b)    Third-Party Warranties. If Franchisee purchases from DonutNV Franchising or its affiliate any items not produced or manufactured by DonutNV Franchising or its affiliate, and if DonutNV Franchising or its affiliate obtained for those items a transferable warranty, then DonutNV Franchising or its affiliate shall transfer that warranty to Franchisee upon Franchisee's purchase. DonutNV Franchising or its affiliate otherwise makes no warranty to Franchisee or to Franchisee's customers for such items. Except as subsequently agreed in writing, DonutNV Franchising or its affiliate shall not be responsible for providing warranty service to Franchisee or to any Franchisee customer for any items. DONUTNV FRANCHISING AND ITS AFFILIATES PROVIDES NO WARRANTY TO FRANCHISEE OR FRANCHISEE'S CUSTOMERS WITH RESPECT TO ITEMS NOT PRODUCED OR MANUFACTURED BY DONUTNV FRANCHISING OR ITS AFFILIATES. THE WARRANTIES, IF ANY, OF THE THIRD-PARTY MANUFACTURER OR SUPPLIER OF SUCH ITEMS, ARE IN LIEU OF ANY AND ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY, QUALITY, PERFORMANCE, OR FITNESS FOR A PARTICULAR PURPOSE.

**8.8    Product Recalls.** If DonutNV Franchising or any vendor, supplier, or manufacturer of an item used or sold in Franchisee's Business issues a recall of such item or otherwise notifies Franchisee that such item is defective or dangerous, Franchisee shall immediately cease using or selling such item, and Franchisee shall at its own expense comply with all instructions from DonutNV Franchising or the vendor, supplier, or manufacturer of such item with respect to such item, including without limitation the recall, repair, and/or replacement of such item.

## ARTICLE 9.   MARKETING

**9.1    Implementation.** Franchisee shall not use any marketing materials or campaigns (including point-of-sale materials, advertising, social media marketing, and sponsorships) that have not been approved by DonutNV Franchising. Franchisee shall implement any marketing plans or campaigns determined by DonutNV Franchising.

**9.2    Use by DonutNV Franchising.** DonutNV Franchising may use any marketing materials or campaigns developed by or on behalf of Franchisee, and Franchisee hereby grants an unlimited, royalty-free license to DonutNV Franchising for such purpose.

**9.3    Brand Fund.** DonutNV Franchising has established or may establish a Brand Fund to promote the System on a local, regional, national, and/or international level. If DonutNV Franchising has established a Brand Fund:

17

(a) <u>Account</u>. DonutNV Franchising is not required to hold the Brand Fund Contributions from franchisees in a bank account separate from DonutNV Franchising's other accounts.

(b) <u>Use</u>. DonutNV Franchising shall use the Brand Fund only for marketing, advertising, and public relations materials, programs and campaigns (including at local, regional, national, and/or international level) for DonutNV, and related overhead. The foregoing includes such activities and expenses as DonutNV Franchising reasonably determines, and may include, without limitation: development and placement of advertising and promotions; sponsorships; contests and sweepstakes; development of décor, trade dress, Marks, and/or branding; development and maintenance of brand websites; social media; internet activities; e-commerce programs; search engine optimization; market research; public relations, media or agency costs; trade shows and other events; printing and mailing; and administrative and overhead expenses related to the Brand Fund (including the compensation of DonutNV Franchising's employees working on marketing and for accounting, bookkeeping, reporting, legal, collections, and other expenses related to the Brand Fund).

(c) <u>Discretion</u>. Franchisee agrees that expenditures from the Brand Fund need not be proportionate to contributions made by Franchisee or provide any direct or indirect benefit to Franchisee. The Brand Fund will be spent at DonutNV Franchising's sole discretion, and DonutNV Franchising has no fiduciary duty with regard to the Brand Fund.

(d) <u>Contribution by Other Outlets</u>. DonutNV Franchising is not obligated to (i) have all other DonutNV businesses (whether owned by other franchisees or by DonutNV Franchising or its affiliates) contribute to the Marketing Fund, or (ii) have other DonutNV businesses that do contribute to the Marketing Fund contribute the same amount or at the same rate as Franchisee.

(e) <u>Surplus or Deficit</u>. DonutNV Franchising may accumulate funds in the Brand Fund and carry the balance over to subsequent years. If the Brand Fund operates at a deficit or requires additional funds at any time, DonutNV Franchising may loan such funds to the National Brand Fund on reasonable terms.

(f) <u>Financial Statement</u>. DonutNV Franchising will prepare an unaudited annual financial statement of the Brand Fund within 120 days of the close of DonutNV Franchising's fiscal year and will provide the financial statement to Franchisee upon written request.

(g) <u>Franchise Development</u>. DonutNV Franchising reserves the right insert information about franchises for sale on advertising prepared by or placed using the Brand Development Fund (provided that such information shall be incidental to the advertising, and not the principal purpose of such advertising).

**9.4 Required Spending.** Franchisee shall spend at least $600 on marketing the Business each 12-month period after the Effective Date. Within 10 days after request by DonutNV Franchising, Franchisee shall furnish proof of its compliance with this Section. DonutNV Franchising has the sole discretion to determine what activities constitute "marketing" under this Section.

DonutNV Franchise Agreement

**9.5    Market Introduction Plan.** Franchisee must develop a market introduction plan and obtain DonutNV Franchising's approval of the market introduction plan at least 30 days before the projected opening date of the Business.

**9.6    Internet Marketing.** DonutNV Franchising has the exclusive right to conduct and manage all marketing and commerce on the internet or other electronic medium, including all websites and "social media" marketing. Franchisee shall not conduct such marketing or commerce, nor establish any website or social media presence independently, except as DonutNV Franchising may specify, and only with DonutNV Franchising's consent. DonutNV Franchising retains the right to approve any linking to or other use of DonutNV Franchising's website. Franchisee must comply with any internet, online commerce and/or social media policy that DonutNV Franchising may prescribe.

**9.7    Advertising Council.** DonutNV Franchising has the right to form an advertising council composed of franchisees, on such terms and conditions as DonutNV Franchising may determine.

### ARTICLE 10.    RECORDS AND REPORTS

**10.1    Systems.** Franchisee shall use such customer data management, sales data management, administrative, bookkeeping, accounting, and inventory control procedures and systems as DonutNV Franchising may specify in the Manual or otherwise in writing.

**10.2    Reports.**

(a)    <u>Financial Reports</u>. Franchisee shall provide such periodic financial reports as DonutNV Franchising may require in the Manual or otherwise in writing, including:

(i)    a monthly profit and loss statement and balance sheet for the Business within 30 days after the end of each calendar month;

(ii)    an annual financial statement (including profit and loss statement, cash flow statement, and balance sheet) for the Business within 90 days after the end of each calendar year; and

(iii)    any information DonutNV Franchising requests in order to prepare a financial performance representation for DonutNV Franchising's franchise disclosure document, within 30 days after request.

(b)    <u>Tax Returns</u>. Franchisee shall provide DonutNV Franchising with copies of all federal and state annual business income tax returns within 30 days after the due date thereof.

(c)    <u>Legal Actions and Investigations</u>. Franchisee shall promptly notify DonutNV Franchising of any Action or threatened Action by any customer, governmental authority, or other third party against Franchisee or the Business, or otherwise involving Franchisee or the Business. Franchisee shall provide such documents and information related to any such Action as DonutNV Franchising may request.

19

(d)      <u>Government Inspections</u>. Franchisee shall give DonutNV Franchising copies of all inspection reports, warnings, certificates, and ratings issued by any governmental entity with respect to the Business, within three days of Franchisee's receipt thereof.

(e)      <u>Other Information</u>. Franchisee shall submit to DonutNV Franchising such other financial statements, reports, budgets, forecasts, records, copies of contracts, documents related to litigation, tax returns, copies of governmental permits, and other documents and information related to the Business as specified in the Manual or that DonutNV Franchising may reasonably request. DonutNV Franchising acknowledges that all personnel records of the Business belong to Franchisee and that this Agreement does not grant DonutNV Franchising the right to access personnel records of Franchisee's employees.

**10.3    Initial Investment Report.** Within 120 days after opening for business, Franchisee shall submit to DonutNV Franchising a report detailing Franchisee's investment costs to develop and open the Business, with costs allocated to the categories described in Item 7 of DonutNV Franchising's Franchise Disclosure Document and with such other information as DonutNV Franchising may request.

**10.4    Business Records.** Franchisee shall keep complete and accurate books and records reflecting all expenditures and receipts of the Business, with supporting documents (including, but not limited to, payroll records, payroll tax returns, register receipts, production reports, sales invoices, bank statements, deposit receipts, cancelled checks and paid invoices) for at least three years. Franchisee may keep such books and records in QuickBooks or other electronic form. Franchisee shall keep such other business records as DonutNV Franchising may specify in the Manual or otherwise in writing.

**10.5    Records Audit.** DonutNV Franchising may examine and audit all books and records related to the Business (other than personnel records of Franchisee's employees), and supporting documentation, at any reasonable time. DonutNV Franchising may require Franchisee to deliver copies of books, records and supporting documentation to a location designated by DonutNV Franchising. Franchisee shall also reimburse DonutNV Franchising for all costs and expenses of the examination or audit if DonutNV Franchising conducted the audit because Franchisee failed to submit required reports or was otherwise not in compliance with the System.

**10.6    Software.** Without limiting the generality of <u>Section 7.1</u> or <u>Section 8.1</u>, Franchisee shall acquire and use all software and related systems required by DonutNV Franchising. Franchisee shall enter into any subscription and support agreements that DonutNV Franchising may require. Franchisee shall upgrade, update, or replace any software from time to time as DonutNV Franchising may require. Franchisee shall protect the confidentiality and security of all software systems, and shall abide by any System Standards related thereto. Franchisee shall give DonutNV Franchising unlimited access to Franchisee's point of sale system and other software systems used in the Business, by any means designated by DonutNV Franchising.

**ARTICLE 11.        FRANCHISOR RIGHTS**

**11.1    Manual; Modification.** The Manual, and any part of the Manual, may be in any form or media determined by DonutNV Franchising. DonutNV Franchising may supplement, revise, or

20

modify the Manual, and DonutNV Franchising may change, add or delete System Standards at any time in its discretion. DonutNV Franchising may inform Franchisee thereof by any method that DonutNV Franchising deems appropriate (which need not qualify as "notice" under <u>Section 18.9</u>). In the event of any dispute as to the contents of the Manual, DonutNV Franchising's master copy will control.

**11.2   Business Evaluation and Inspection.** DonutNV Franchising may conduct an evaluation of the Business and an inspection of the Unit before, during, or after any event where Franchisee provides services. Franchisee shall cooperate with DonutNV Franchising's evaluators and inspectors. The evaluation and inspection may include, but is not limited to, observing operations, conducting a physical inventory, evaluating physical condition of the Unit and equipment, monitoring sales activity, speaking with employees and customers, and removing samples of products, supplies and materials. DonutNV Franchising may videotape and/or take photographs of the evaluation and inspection. DonutNV Franchising may set a minimum score requirement for evaluations, and Franchisee's failure to meet or exceed the minimum score will be a default under this Agreement. Without limiting DonutNV Franchising's other rights under this Agreement, Franchisee will, as soon as reasonably practical, correct any deficiencies noted during an evaluation and inspection. If DonutNV Franchising conducts an evaluation and inspection because of a governmental report, customer complaint or other customer feedback, or a default or non-compliance with any System Standard by Franchisee (including following up a previous failed evaluation), or if the evaluation and inspection identifies a material non-compliance with any System Standard or any other default under this Agreement, then DonutNV Franchising may charge all out-of-pocket expenses plus its then-current evaluation fee to Franchisee.

**11.3   DonutNV Franchising's Right to Cure.** If Franchisee breaches or defaults under any provision of this Agreement, DonutNV Franchising may (but has no obligation to) take any action to cure the default on behalf of Franchisee, without any liability to Franchisee. Franchisee shall reimburse DonutNV Franchising for its costs and expenses (including the allocation of any internal costs) for such action, plus 10% as an administrative fee.

**11.4   Right to Suspend Supplies Upon Default.** While Franchisee is in default or breach of this Agreement, DonutNV Franchising may (i) require that Franchisee pay cash on delivery for products or services supplied by DonutNV Franchising, (ii) stop selling or providing any products and services to Franchisee, and/or (iii) request any third party vendors to not sell or provide products or services to Franchisee. No such action by DonutNV Franchising shall be a breach or constructive termination of this Agreement, change in competitive circumstances or similarly characterized, and Franchisee shall not be relieved of any obligations under this Agreement because of any such action. Such rights of DonutNV Franchising are in addition to any other right or remedy available to DonutNV Franchising.

**11.5   Business Data.** Except as stated in this Section, all customer data collected by or generated by the Business and all data collected or generated by the primary software operating system of the Business is Confidential Information and is exclusively owned by DonutNV Franchising. DonutNV Franchising hereby licenses such data back to Franchisee without charge solely for Franchisee's use in connection with the Business for the term of this Agreement. Notwithstanding anything herein to the contrary, any data concerning Franchisee's employees,

and any data constituting personal data under any applicable privacy law or regulation shall not be owned by DonutNV Franchising.

**11.6** **Innovations.** Franchisee shall disclose to DonutNV Franchising all ideas, plans, improvements, concepts, recipes, methods, and techniques relating to the Business (collectively, "Innovations") conceived or developed by Franchisee, its employees, agents or contractors. DonutNV Franchising will automatically own all Innovations, and will have the right to use and incorporate any Innovations into the System, without any compensation to Franchisee. Franchisee shall execute any documents reasonably requested by DonutNV Franchising to document DonutNV Franchising's ownership of Innovations.

**11.7** **Communication Systems.** If DonutNV Franchising provides email accounts and/or other communication systems to Franchisee, then Franchisee acknowledges that it has no expectation of privacy in the assigned email accounts and other communications systems, and authorizes DonutNV Franchising to access such communications.

**11.8** **Communication with Employees.** Franchisee irrevocably authorizes DonutNV Franchising to communicate with Franchisee's employees and contractors on any matter related to the System or the Business. Franchisee will not prohibit any employee or contractor from communicating with DonutNV Franchising on any matter related to the System or the Business.

**11.9** **Communications with Landlord and Lenders.** Franchisee irrevocably authorizes DonutNV Franchising to communicate with Franchisee's landlord and lender(s), or prospective landlord and lender(s), about matters relating to the Business, and to provide information about the Business to them.

**11.10** **Delegation.** DonutNV Franchising may delegate any duty or obligation of DonutNV Franchising under this Agreement to an affiliate or a third party.

**11.11** **System Variations.** DonutNV Franchising may vary or waive any System Standard for any one or more DonutNV franchises due to the peculiarities of the particular site or circumstances, density of population, business potential, population of trade area, existing business practices, applicable laws or regulations, or any other condition relevant to the performance of a franchise or group of franchises. Franchisee is not entitled to the same variation or waiver.

**11.12** **Temporary Public Safety Closure.** If DonutNV Franchising discovers or becomes aware of any aspect of the Business which, in DonutNV Franchising's opinion, constitutes an imminent danger to the health or safety of any person, then immediately upon DonutNV Franchising's order, Franchisee must temporarily cease operations of the Business and remedy the dangerous condition. DonutNV Franchising shall have no liability to Franchisee or any other person for action or failure to act with respect to a dangerous condition.

**11.13** **Temporary Control.** If (i) Franchisee (or, if Franchisee is an entity, the Owner with the largest interest in Franchisee) dies, becomes incapacitated, or is otherwise unable to manage the Business, (ii) this Agreement is terminated or expires and DonutNV Franchising elects to purchase assets of the Business as provided in Section 14.6, or (iii) Franchisee is operating the Business in a manner which, in DonutNV Franchising's reasonable opinion, constitutes a danger

DonutNV Franchise Agreement

to the health or safety of any person, then DonutNV Franchising may (but is not obligated to) operate and manage the Business for Franchisee's (or Franchisee's estate's) account until this Agreement is terminated, the Business is transferred, the Business is purchased by DonutNV Franchising, or DonutNV Franchising returns the Business to Franchisee. DonutNV Franchising's operation and management will not continue for more than 90 days without Franchisee's consent (or the consent of the representatives of Franchisee's estate). If this Agreement has not terminated or expired, then DonutNV Franchising will account to Franchisee for all net income from the Business during the period in which DonutNV Franchising operates the Business. DonutNV Franchising may collect a temporary management fee equal to 40% of gross sales for the period in which DonutNV Franchising operates the Business, plus all out-of-pocket expenses incurred by DonutNV Franchising, payable monthly.

**11.12   Franchisor's Discretion.** DonutNV Franchising may engage in any activity not expressly prohibited by this Agreement. Whenever this Agreement provides that DonutNV Franchising has a certain right, that right is absolute and the parties intend that DonutNV Franchising's exercise of that right will not be subject to any limitation or review. DonutNV Franchising has the right to operate, administrate, develop, and change the System in any manner that is not specifically precluded by the provisions of this Agreement, although this right does not modify any express limitations set forth in this Agreement. Whenever DonutNV Franchising agrees to exercise its rights reasonably or in good faith, DonutNV Franchising will have satisfied its obligations whenever its exercises reasonable business judgment in making a decision or exercising its rights. DonutNV Franchising's decisions or actions will be deemed to be the result of reasonable business judgment, even if other reasonable or even arguably preferable alternatives are available, if DonutNV Franchising's decision or action is intended, in whole or significant part, to promote or benefit the System or the DonutNV brand generally even if the decision or action also promotes DonutNV Franchising's financial or other individual interest. Examples of items that will promote or benefit the System or the DonutNV brand include enhancing the value of the Marks, improving customer service and satisfaction, improving product quality, improving uniformity, enhancing or encouraging modernization, and improving the competitive position of the System and DonutNV outlets.

## ARTICLE 12.      MARKS

**12.1    Authorized Marks.** Franchisee shall use no trademarks, service marks or logos in connection with the Business other than the Marks. Franchisee shall use all Marks specified by DonutNV Franchising, and only in the manner as DonutNV Franchising may require. Franchisee has no rights in the Marks other than the right to use them in the operation of the Business in compliance with this Agreement. All use of the Marks by Franchisee and any goodwill associated with the Marks, including any goodwill arising due to Franchisee's operation of the Business, will inure to the exclusive benefit of DonutNV Franchising.

**12.2    Change of Marks.** DonutNV Franchising may replace, add, modify, or discontinue any Marks to be used under the System. Within a reasonable time after DonutNV Franchising makes any such change (not to exceed 90 days), Franchisee must comply with the change, at Franchisee's expense.

23

DonutNV Franchise Agreement

**12.3    Infringement.**

(a)    <u>Defense of Franchisee</u>. If Franchisee has used the Marks in accordance with this Agreement, then (i) DonutNV Franchising shall defend Franchisee (at DonutNV Franchising's expense) against any Action by a third party alleging infringement by Franchisee's use of a Mark, and (ii) DonutNV Franchising will indemnify Franchisee for expenses and damages if the Action is resolved unfavorably to Franchisee.

(b)    <u>Infringement by Third Party</u>. Franchisee shall promptly notify DonutNV Franchising if Franchisee becomes aware of any possible infringement of a Mark by a third party. DonutNV Franchising may, in its sole discretion, commence or join any claim against the infringing party.

(c)    <u>Control</u>. DonutNV Franchising shall have the exclusive right to control any prosecution or defense of any Action related to possible infringement of or by the Marks.

**12.4    Name.** If Franchisee is an entity, it shall not use the word "DonutNV" or any confusingly similar words in its legal name.

**ARTICLE 13.        COVENANTS**

**13.1    Confidential Information.** With respect to all Confidential Information, Franchisee shall (a) adhere to all procedures prescribed by DonutNV Franchising for maintaining confidentiality, (b) disclose such information to its employees only to the extent necessary for the operation of the Business, (c) not use any such information in any other business or in any manner not specifically authorized in writing by DonutNV Franchising, (d) exercise the highest degree of diligence and effort to maintain the confidentiality of all such information during and after the term of this Agreement, (e) not copy or otherwise reproduce any Confidential Information, and (f) promptly report any unauthorized disclosure or use of Confidential Information. Franchisee acknowledges that all Confidential Information is owned by DonutNV Franchising (except for Confidential Information which DonutNV Franchising licenses from another person or entity). This Section will survive the termination or expiration of this Agreement indefinitely.

**13.2    Covenants Not to Compete.**

(a)    <u>Restriction – In Term</u>. During the term of this Agreement, neither Franchisee, any Owner, nor any spouse of an Owner (the "<u>Restricted Parties</u>") shall directly or indirectly have any ownership interest in, lend money or provide financial assistance to, provide any services to, or be employed by, any Competitor.

(b)    <u>Restriction – Post Term</u>. For two years after this Agreement expires or is terminated for any reason (or, if applicable, for two years after a Transfer), no Restricted Party shall directly or indirectly have any ownership interest in, lend money or provide financial assistance to, provide any services to, or be employed by, any Competitor operating in any of Franchisee's Territory or within 25 miles thereof, or in the territory of any other DonutNV business operating on the date of expiration, termination, or transfer, as applicable.

24

(c)    Interpretation. The parties agree that each of the foregoing covenants is independent of any other covenant or provision of this Agreement. If all or any portion of the covenants in this Section is held to be unenforceable or unreasonable by any court, then the parties intend that the court modify such restriction to the extent reasonably necessary to protect the legitimate business interests of DonutNV Franchising. Franchisee agrees that the existence of any claim it may have against DonutNV Franchising shall not constitute a defense to the enforcement by DonutNV Franchising of the covenants of this Section. If a Restricted Party fails to comply with the obligations under this Section during the restrictive period, then the restrictive period will be extended an additional day for each day of noncompliance.

**13.3    Employee Recruitment.** During the term of this Agreement and for one year after termination, transfer, or expiration of this Agreement, Franchisee shall not knowingly employ or seek to employ or engage as an independent contractor any person then employed by DonutNV Franchising or its affiliates.

**13.4    General Manager and Key Employees.** If requested by DonutNV Franchising, Franchisee will cause its general manager and other key employees that DonutNV Franchising reasonably designates to sign DonutNV Franchising's then-current form of confidentiality and non-compete agreement (unless prohibited by applicable law).

### ARTICLE 14.        DEFAULT AND TERMINATION

**14.1    Termination by Franchisee.** Franchisee may terminate this Agreement only if DonutNV Franchising violates a material provision of this Agreement and fails to cure or to make substantial progress toward curing the violation within 30 days after receiving written notice from Franchisee detailing the alleged default. Termination by Franchisee is effective 10 days after DonutNV Franchising receives written notice of termination.

**14.2    Termination by DonutNV Franchising.**

(a)    Subject to 10-Day Cure Period. DonutNV Franchising may terminate this Agreement if Franchisee does not make any payment to DonutNV Franchising when due, or if Franchisee does not have sufficient funds in its account when DonutNV Franchising attempts an electronic funds withdrawal, and Franchisee fails to cure such non-payment within 10 days after DonutNV Franchising gives notice to Franchisee of such breach.

(b)    Subject to 30-Day Cure Period. If Franchisee breaches this Agreement in any manner not described in subsection (a) or (c), and fails to cure such breach to DonutNV Franchising's satisfaction within 30 days after DonutNV Franchising gives notice to Franchisee of such breach, then DonutNV Franchising may terminate this Agreement.

(c)    Without Cure Period. DonutNV Franchising may terminate this Agreement by giving notice to Franchisee, without opportunity to cure, if any of the following occur:

(i)    Franchisee misrepresented or omitted material facts when applying to be a franchisee, or breaches any representation in this Agreement;

25

DonutNV Franchise Agreement

(ii)    Franchisee knowingly submits any false report or knowingly provides any other false information to DonutNV Franchising;

(iii)    a receiver or trustee for the Business or all or substantially all of Franchisee's property is appointed by any court, or Franchisee makes a general assignment for the benefit of Franchisee's creditors, or Franchisee is unable to pay its debts as they become due, or a levy or execution is made against the Business, or an attachment or lien remains on the Business for 30 days unless the attachment or lien is being duly contested in good faith by Franchisee, or a petition in bankruptcy is filed by Franchisee, or such a petition is filed against or consented to by Franchisee and the petition is not dismissed within 45 days, or Franchisee is adjudicated as bankrupt;

(iv)    Franchisee fails to open for business by the date specified on the Summary Page;

(v)    Franchisee or any Owner commits a material violation of Section 7.2 (compliance with laws) or Section 13.1 (confidentiality), violates Section 13.2 (non-compete) or Article 15 (transfer), or commits any other violation of this Agreement which by its nature cannot be cured;

(vi)    Franchisee abandons or ceases operation of the Business for more than 30 days, or otherwise indicates its decision to cease operation of the Business;

(vii)    Franchisee loses possession of the Unit;

(viii)    Franchisee or any Owner slanders or libels DonutNV Franchising or any of its employees, directors, or officers;

(ix)    Franchisee refuses to cooperate with or permit any audit, evaluation or inspection by DonutNV Franchising or its agents or contractors, or otherwise fails to comply with Section 10.5 or Section 11.2.

(x)    the Business is operated in a manner which, in DonutNV Franchising's reasonable judgment, constitutes a significant danger to the health or safety of any person, and Franchisee fails to cure such danger within 48 hours after becoming aware of the danger (due to notice from DonutNV Franchising or otherwise);

(xi)    Franchisee has received two or more notices of default and Franchisee commits another breach of this Agreement, all in the same 12-month period (regardless of whether the defaults were cured and regardless of whether the defaults are for the same or different breaches of this Agreement);

(xii)    DonutNV Franchising (or any affiliate) terminates any other agreement with Franchisee (or any affiliate) due to the breach of such other agreement by Franchisee (or its affiliate);

(xiii)    Franchisee or any Owner is charged with, pleads guilty or no-contest to, or is convicted of a felony; or

DonutNV Franchise Agreement

(xiv)   Franchisee or any Owner is accused by any governmental authority or third party of any act, or if Franchisee or any Owner commits any act or series of acts, that in DonutNV Franchising's opinion is reasonably likely to materially and unfavorably affect the DonutNV brand.

**14.3   Effect of Termination.** Upon termination or expiration of this Agreement, all obligations that by their terms or by reasonable implication survive termination, including those pertaining to non-competition, confidentiality, indemnity, and dispute resolution, will remain in effect, and Franchisee must immediately:

(i)   pay all amounts owed to DonutNV Franchising based on the operation of the Business through the effective date of termination or expiration;

(ii)   return to DonutNV Franchising all copies of the Manual, Confidential Information and any and all other materials provided by DonutNV Franchising to Franchisee or created by a third party for Franchisee relating to the operation of the Business, and all items containing any Marks, copyrights, and other proprietary items (to the extent in the possession or control of Franchisee); and delete all Confidential Information and proprietary materials from electronic devices;

(iii)   notify the telephone, internet, email, electronic network, directory, and listing entities of the termination or expiration of Franchisee's right to use any numbers, addresses, domain names, locators, directories and listings associated with any of the Marks, and authorize their transfer to DonutNV Franchising or any new franchisee as may be directed by DonutNV Franchising, and Franchisee hereby irrevocably appoints DonutNV Franchising, with full power of substitution, as its true and lawful attorney-in-fact, which appointment is coupled with an interest; to execute such directions and authorizations as may be necessary or appropriate to accomplish the foregoing; and

(iv)   cease doing business under any of the Marks.

**14.4   Remove Identification.** Within 30 days after termination or expiration, Franchisee shall at its own expense "de-identify" the Unit so that it no longer contains the Marks, signage, or any trade dress of a DonutNV business, to the reasonable satisfaction of DonutNV Franchising. Franchisee shall comply with any reasonable instructions and procedures of DonutNV Franchising for de-identification. Franchisee shall not use the Unit for any purpose whatsoever prior to completing such de-identification.

**14.5   Other Claims.** Termination of this Agreement by DonutNV Franchising will not affect or discharge any claims, rights, causes of action or remedies (including claims for DonutNV Franchising's lost future income after termination), which DonutNV Franchising may have against Franchisee, whether arising before or after termination.

**14.6   Purchase Option.** When this Agreement expires or is terminated, DonutNV Franchising will have the right (but not the obligation) to purchase any or all of the Unit, equipment, and other assets related to the Business chosen by DonutNV Franchising, for a price equal to the

DonutNV Franchise Agreement

depreciated book value thereof. To exercise this option, DonutNV Franchising must notify Franchisee no later than 30 days after this Agreement expires or is terminated. DonutNV Franchising's purchase will be of assets only (free and clear of all liens), and will not include any liabilities of Franchisee. If DonutNV Franchising exercises the purchase option, DonutNV Franchising may deduct from the purchase price: (a) all amounts due from Franchisee, and (b) amounts which DonutNV paid or will pay to third parties to satisfy indebtedness owed by Franchisee to third parties. If any of the assets are subject to a lien, DonutNV Franchising may pay a portion of the purchase price directly to the lienholder to pay off such lien. DonutNV Franchising may withhold 25% of the purchase price for 90 days to ensure that all of Franchisee's taxes and other liabilities are paid. DonutNV Franchising may assign this purchase option to another party.

## ARTICLE 15.  TRANSFERS

**15.1  By DonutNV Franchising.** DonutNV Franchising may transfer or assign this Agreement, or any of its rights or obligations under this Agreement, to any person or entity, and DonutNV Franchising may undergo a change in ownership and/or control, without the consent of Franchisee.

**15.2  By Franchisee.** Franchisee acknowledges that the rights and duties set forth in this Agreement are personal to Franchisee and that DonutNV Franchising entered into this Agreement in reliance on Franchisee's business skill, financial capacity, personal character, experience, and business ability. Accordingly, Franchisee shall not conduct or undergo a Transfer without providing DonutNV Franchising at least 60 days prior notice of the proposed Transfer, and without obtaining DonutNV Franchising's consent. In granting any such consent, DonutNV Franchising may impose conditions, including, without limitation, the following:

(i)  DonutNV Franchising receives a transfer fee equal to $10,000, plus any broker fees incurred by DonutNV Franchising in connection with the Transfer;

(ii)  the proposed Transferee and its owners have completed DonutNV Franchising's franchise application processes, meet DonutNV Franchising's then-applicable standards for new franchisees, and have been approved by DonutNV Franchising as franchisees;

(iii)  the proposed Transferee is not a Competitor;

(iv)  the proposed Transferee executes DonutNV Franchising's then-current form of franchise agreement and any related documents, which form may contain materially different provisions than this Agreement;

(v)  Franchisee has paid all monetary obligations to DonutNV Franchising and its affiliates, and to any lessor, vendor, supplier, or lender to the Business, full, and Franchisee is not otherwise in default or breach of this Agreement or of any other obligation to owed to DonutNV Franchising or its affiliates;

(vi)  all owners of the proposed Transferee provide a guaranty in accordance with Section 2.5;

28

DonutNV Franchise Agreement

(vii)    the proposed Transferee and its owners and employees undergo such training as DonutNV Franchising may require;

(viii)    Franchisee, its Owners, and the transferee and its owners execute a general release of DonutNV Franchising in a form satisfactory to DonutNV Franchising; and

(ix)    the Business fully complies with all of DonutNV Franchising's most recent System Standards.

**15.3     Transfer for Convenience of Ownership.** If Franchisee is an individual, Franchisee may Transfer this Agreement to a corporation or limited liability company formed for the convenience of ownership after at least 15 days' notice to DonutNV Franchising, if, prior to the Transfer: (1) the transferee provides the information required by Section 2.3; (2) Franchisee provides copies of the entity's charter documents, by-laws (or operating agreement) and similar documents, if requested by DonutNV Franchising, (3) Franchisee owns all voting securities of the corporation or limited liability company, and (4) Franchisee provides a guaranty in accordance with Section 2.5.

**15.4     Transfer upon Death or Incapacity.** Upon the death or incapacity of Franchisee (or, if Franchisee is an entity, the Owner with the largest ownership interest in Franchisee), the executor, administrator, or personal representative of that person must Transfer the Business to a third party approved by DonutNV Franchising (or to another person who was an Owner at the time of death or incapacity of the largest Owner) within 180 days after death or incapacity. Such transfer must comply with Section 15.2.

**15.5     DonutNV Franchising's Right of First Refusal.** Before Franchisee (or any Owner) engages in a Transfer (except under Section 15.3 or to a spouse, sibling, or child of an Owner), DonutNV Franchising will have a right of first refusal, as set forth in this Section. Franchisee (or its Owners) shall provide to DonutNV Franchising a copy of the terms and conditions of any Transfer. For a period of 30 days from the date of DonutNV Franchising's receipt of such copy, DonutNV Franchising will have the right, exercisable by notice to Franchisee, to purchase the assets subject of the proposed Transfer for the same price and on the same terms and conditions (except that DonutNV Franchising may substitute cash for any other form of payment). If DonutNV Franchising does not exercise its right of first refusal, Franchisee may proceed with the Transfer, subject to the other terms and conditions of this Article.

**15.6     No Sublicense.** Franchisee has no right to sublicense the Marks or any of Franchisee's rights under this Agreement.

**15.7     No Lien on Agreement.** Franchisee shall not grant a security interest in this Agreement to any person or entity. If Franchisee grants an "all assets" security interest to any lender or other secured party, Franchisee shall cause the secured party to expressly exempt this Agreement from the security interest.

**ARTICLE 16.     INDEMNITY**

**16.1     Indemnity.** Franchisee shall indemnify and defend (with counsel reasonably acceptable to DonutNV Franchising) DonutNV Franchising, its parent entities, subsidiaries and affiliates,

29

DonutNV Franchise Agreement

and their respective owners, directors, officers, employees, agents, successors and assignees (collectively, "Indemnitees") against all Losses in any Action by or against DonutNV Franchising and/or any Indemnitee directly or indirectly related to, or alleged to arise out of, the operation of the Business. Notwithstanding the foregoing, Franchisee shall not be obligated to indemnify an Indemnitee from Actions which Franchisee proves arose solely as a result of any Indemnitee's intentional misconduct or gross negligence. Any delay or failure by an Indemnitee to notify Franchisee of an Action shall not relieve Franchisee of its indemnity obligation except to the extent (if any) that such delay or failure materially prejudices Franchisee. Franchisee shall not settle an Action without the consent of the Indemnitee. This indemnity will continue in effect after this Agreement ends.

**16.2    Assumption.** An Indemnitee may elect to assume the defense and/or settlement of any Action subject to this indemnification, and control all aspects of defending the Action (including negotiations and settlement), at Franchisee's expense. Such an undertaking shall not diminish Franchisee's obligation to indemnify the Indemnitees.

## ARTICLE 17.    DISPUTE RESOLUTION

**17.1    Arbitration.**

(a)    <u>Disputes Subject to Arbitration</u>. Except as expressly provided in subsections (c) and (d), any controversy or claim between the parties (including any controversy or claim arising out of or relating to this Agreement or its formation, and including any question of arbitrability) shall be resolved by arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules, including the Optional Rules for Emergency Measures of Protection. Judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction.

(b)    <u>Location</u>. The place of arbitration shall be the city and state where DonutNV Franchising's headquarters are located.

(c)    <u>Injunctive Relief</u>. Either party may apply to the arbitrator seeking injunctive relief until the arbitration award is rendered or the controversy is otherwise resolved. Either party also may, without waiving any remedy or right to arbitrate under this Agreement, seek from any court having jurisdiction any interim or provisional injunctive relief.

(d)    <u>Intellectual Property Claims</u>. Either party may bring a claim involving an alleged infringement of any of DonutNV Franchising's intellectual property rights in a court authorized to hear such claims under <u>Section 17.5</u> of this Agreement.

(e)    <u>Confidentiality</u>. All documents, information, and results pertaining to any arbitration or lawsuit will be confidential, except as required by law or as required for DonutNV Franchising to comply with laws and regulations applicable to the sale of franchises.

(f)    <u>Performance During Arbitration or Litigation</u>. Unless this Agreement has been terminated, DonutNV Franchising and Franchisee will comply with this Agreement and perform their respective obligations under this Agreement during the arbitration or litigation process.

**17.2    Damages.** In any controversy or claim arising out of or relating to this Agreement, each party waives any right to punitive or other monetary damages not measured by the prevailing party's actual damages, except damages authorized by federal statute. In the event of termination of this Agreement prior to the expiration of the term due to Franchisee's default, DonutNV Franchising's actual damages will include its lost future income from Royalty Fees and other amounts that Franchisee would have owed to DonutNV Franchising but for the termination.

**17.3    Waiver of Class Actions.** The parties agree that any claims will be arbitrated, litigated, or otherwise resolved on an individual basis, and waive any right to act on a class-wide basis.

**17.4    Time Limitation.** Any arbitration or other legal action arising from or related to this Agreement must be instituted within two years from the date of the conduct or event that forms the basis of the arbitration or other legal action. The foregoing time limit does not apply to claims (i) by DonutNV Franchising related to non-payment of amounts owed by Franchisee, (ii) for indemnity under Article 16, or (iii) related to unauthorized use of Confidential Information or the Marks.

**17.5    Venue Other Than Arbitration.** For any legal proceeding not required to be submitted to arbitration, the parties agree that any such legal proceeding will be brought in the United States District Court where DonutNV Franchising's headquarters is then located. If there is no federal jurisdiction over the dispute, the parties agree that any such legal proceeding will be brought in the court of record of the state and county where DonutNV Franchising's headquarters is then located. Each party consents to the jurisdiction of such courts and waives any objection that it, he or she may have to the laying of venue of any proceeding in any of these courts.

**17.6    Legal Costs.** In any legal proceeding (including arbitration) related to this Agreement or any guaranty, the non-prevailing party shall pay the prevailing party's attorney fees, costs and other expenses of the legal proceeding. "Prevailing party" means the party, if any, which prevailed upon the central litigated issues and obtained substantial relief.

## ARTICLE 18.    MISCELLANEOUS

**18.1    Relationship of the Parties.** The parties are independent contractors, and neither is the agent, partner, joint venturer, or employee of the other. DonutNV Franchising is not a fiduciary of Franchisee and does not control Franchisee or its Business. Any required specifications and standards in this Agreement and in the System Standards exist to protect DonutNV Franchising's interest in the System and the Marks, and the goodwill established in them, and not for the purpose of establishing any control, or duty to take control, over the Business. DonutNV Franchising has no liability for Franchisee's obligations to any third party whatsoever.

**18.2    No Third Party Beneficiaries.** This Agreement does not confer any rights or remedies upon any person or entity other than Franchisee, DonutNV Franchising, and DonutNV Franchising's affiliates.

**18.3    Entire Agreement.** This Agreement constitutes the entire agreement of the parties and supersedes all prior negotiations and representations. Nothing in this Agreement or in any related

DonutNV Franchise Agreement

agreement is intended to disclaim the representations made by DonutNV Franchising in its franchise disclosure document.

**18.4    Modification.** No modification or amendment of this Agreement will be effective unless it is in writing and signed by both parties. This provision does not limit DonutNV Franchising's rights to modify the Manual or System Standards.

**18.5    Consent; Waiver.** No consent under this Agreement, and no waiver of satisfaction of a condition or nonperformance of an obligation under this Agreement will be effective unless it is in writing and signed by the party granting the consent or waiver. No waiver by a party of any right will affect the party's rights as to any subsequent exercise of that right or any other right. No delay, forbearance or omission by a party to exercise any right will constitute a waiver of such right.

**18.6    Cumulative Remedies.** Rights and remedies under this Agreement are cumulative. No enforcement of a right or remedy precludes the enforcement of any other right or remedy.

**18.7    Severability.** The parties intend that (i) if any provision of this Agreement is held by an arbitrator or court to be unenforceable, then that provision be modified to the minimum extent necessary to make it enforceable, unless that modification is not permitted by law, in which case that provision will be disregarded, and (ii) if an unenforceable provision is modified or disregarded, then the rest of this Agreement will remain in effect as written.

**18.8    Governing Law.** The laws of the State of Florida (without giving effect to its principles of conflicts of law) govern all adversarial proceedings between the parties. The parties agree that any Florida law for the protection of franchisees or business opportunity purchasers) will not apply unless its jurisdictional requirements are met independently without reference to this Section 18.8.

**18.9    Notices.** Any notice will be effective under this Agreement only if made in writing and delivered as set forth in this Section to: (A) if to Franchisee, addressed to Franchisee at the notice address set forth in the Summary Page; and (B) if to DonutNV Franchising, addressed to 9101 International Dr., Suite 1304, Orlando, FL 32819. Any party may designate a new address for notices by giving notice of the new address pursuant to this Section. Notices will be effective upon receipt (or first rejection) and must be: (1) delivered personally; (2) sent by registered or certified U.S. mail with return receipt requested; or (3) sent via overnight courier. Notwithstanding the foregoing, DonutNV Franchising may amend the Manual, give binding notice of changes to System Standards, and deliver notices of default by electronic mail or other electronic communication.

**18.10   Joint and Several Liability.** If two or more people sign this Agreement as "Franchisee", each will have joint and several liability.

**18.11   No Offer and Acceptance.** Delivery of a draft of this Agreement to Franchisee by DonutNV Franchising does not constitute an offer. This Agreement shall not be effective unless and until it is executed by both Franchisee and DonutNV Franchising.

32

DonutNV Franchise Agreement

## ARTICLE 19.    CERTIFICATION OF FRANCHISOR'S COMPLIANCE

By signing this Agreement, Franchisee acknowledges the following:

(1)     Franchisee understands all the information in DonutNV Franchising's Disclosure Document.

(2)     Franchisee understands the success or failure of the Business will depend in large part upon Franchisee's skills, abilities and efforts and those of the persons Franchisee employs, as well as many factors beyond Franchisee's control such as weather, competition, interest rates, the economy, inflation, labor and supply costs, lease terms and the marketplace.

(3)     That no person acting on DonutNV Franchising's behalf made any statement or promise regarding the costs involved in operating a DonutNV franchise that is not in the Disclosure Document or that is contrary to, or different from, the information in the Disclosure Document.

(4)     That no person acting on DonutNV Franchising's behalf made any claim or representation to Franchisee, orally, visually, or in writing, that contradicted the information in the Disclosure Document.

(5)     That no person acting on DonutNV Franchising's behalf made any statement or promise regarding the actual, average or projected profits or earnings, the likelihood of success, the amount of money Franchisee may earn, or the total amount of revenue a DonutNV franchise will generate, that is not in the Disclosure Document or that is contrary to, or different from, the information in the Disclosure Document.

(6)     That no person acting on DonutNV Franchising's behalf made any statement or promise or agreement, other than those matters addressed in this Agreement, concerning advertising, marketing, media support, market penetration, training, support service, or assistance that is contrary to, or different from, the information contained in the Disclosure Document.

(7)     Franchisee understands that this Agreement contains the entire agreement between DonutNV Franchising and Franchisee concerning the DonutNV franchise, which means that any oral or written statements not set out in this Agreement will not be binding. In deciding to enter into this Agreement, Franchisee is not relying on any statement, promise, claim, or representation not expressly set forth in this Agreement or in the Disclosure Document.

[*Signatures on next page*]

DonutNV Franchise Agreement

Agreed to by:

FRANCHISOR:

DONUTNV FRANCHISING, INC.

By: _Alex Gingold_____

Name: Alex Gingold

Title: Co-Founder, CEO & Donut Connoisseur

Date: 12/23/2022 | 7:31 PST _____

FRANCHISEE:

MATTHEW S. FURMAN

By: _Matt Furman_____

Name: Matthew S. Furman, individually

Date: 12/15/2022 | 2:21 PST _____

(*Check if applicable*) At the same time as the parties execute this Agreement, they are also executing a Rider to Franchise Agreement pursuant to:

_____ Illinois
_____ Indiana
_____ Maryland
_____ Minnesota
_____ New York
_____ North Dakota
_____ Rhode Island
_____ Washington
_____ Other

34

DonutNV Franchise Agreement

## **Attachment 1 to Franchise Agreement**

### **OWNERSHIP INFORMATION**

1.      **Form of Ownership.** Franchisee is a (check one):

|                |                              |
|----------------|------------------------------|
| _____X_____    | *Sole Proprietorship*        |
| _____    | *Partnership*                |
| _____    | *Limited Liability Company*  |
| _____    | *Corporation*                |

State: Colorado

2.      **Owners.** If Franchisee is a partnership, limited liability company or corporation:

| Name | Shares or Percentage of Ownership |
|------|-----------------------------------|
| Matthew S. Furman | 100% |
|  |  |
|  |  |
|  |  |
|  |  |

3.      **Officers.** If Franchisee is a limited liability company or corporation:

| Name | Title |
|------|-------|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

35

DonutNV Franchise Agreement

**Attachment 2 to Franchise Agreement**

**GUARANTY AND NON-COMPETE AGREEMENT**

This Guaranty and Non-Compete Agreement (this "Guaranty") is executed by the undersigned person(s) (each, a "Guarantor") in favor of DonutNV Franchising, Inc., a Pennsylvania corporation ("DonutNV Franchising").

**Background Statement:** _____ ("Franchisee") desires to enter into a Franchise Agreement with DonutNV Franchising for the franchise of a DonutNV business (the "Franchise Agreement"; capitalized terms used but not defined in this Guaranty have the meanings given in the Franchise Agreement). Guarantor owns an equity interest in Franchisee. Guarantor is executing this Guaranty in order to induce DonutNV Franchising to enter into the Franchise Agreement.

Guarantor agrees as follows:

**1.    Guaranty.** Guarantor hereby unconditionally guarantees to DonutNV Franchising and its successors and assigns that Franchisee shall pay and perform every undertaking, agreement and covenant set forth in the Franchise Agreement and further guarantees every other liability and obligation of Franchisee to DonutNV Franchising, whether or not contained in the Franchise Agreement. Guarantor shall render any payment or performance required under the Franchise Agreement or any other agreement between Franchisee and DonutNV Franchising upon demand from DonutNV Franchising. Guarantor waives (a) acceptance and notice of acceptance by DonutNV Franchising of this Guaranty; (b) notice of demand for payment of any indebtedness or nonperformance of any obligations of Franchisee; (c) protest and notice of default to any party with respect to the indebtedness or nonperformance of any obligations hereby guaranteed; (d) any right Guarantor may have to require that an action be brought against Franchisee or any other person or entity as a condition of liability hereunder; (e) all rights to payments and claims for reimbursement or subrogation which any of the undersigned may have against Franchisee arising as a result of the execution of and performance under this Guaranty by the undersigned; (f) any law which requires that DonutNV Franchising make demand upon, assert claims against or collect from Franchisee or any other person or entity (including any other guarantor), foreclose any security interest, sell collateral, exhaust any remedies or take any other action against Franchisee or any other person or entity (including any other guarantor) prior to making any demand upon, collecting from or taking any action against the undersigned with respect to this Guaranty; and (g) any and all other notices and legal or equitable defenses to which Guarantor may be entitled.

**2.    Confidential Information.** With respect to all Confidential Information, Guarantor shall (a) adhere to all security procedures prescribed by DonutNV Franchising for maintaining confidentiality, (b) disclose such information to its employees only to the extent necessary for the operation of the Business, (c) not use any such information in any other business or in any manner not specifically authorized or approved in writing by DonutNV Franchising, (d) exercise the highest degree of diligence and make every effort to maintain the confidentiality of all such information during and after the term of the Franchise Agreement, (e) not copy or otherwise

36

reproduce any Confidential Information, and (f) promptly report any unauthorized disclosure or use of Confidential Information. Guarantor acknowledges that all Confidential Information is owned by DonutNV Franchising or its affiliates (except for Confidential Information which DonutNV Franchising licenses from another person or entity). This Section will survive the termination or expiration of the Franchise Agreement indefinitely.

3.      **Covenants Not to Compete.**

(a)      Restriction - In Term. During the term of the Franchise Agreement, Guarantor shall not directly or indirectly have any ownership interest in, lend money or provide financial assistance to, provide any services to, or be employed by, any Competitor.

(b)      Restriction – Post Term. For two years after the Franchise Agreement expires or is terminated for any reason (or, if applicable, for two years after a Transfer by Guarantor), Guarantor shall not directly or indirectly have any ownership interest in, lend money or provide financial assistance to, provide any services to, or be employed by, any Competitor operating in any of Franchisee's Territory or within 25 miles thereof, or in the territory of any other DonutNV business operating on the date of expiration, termination, or transfer, as applicable.

(c)      Interpretation. Guarantor agrees that each of the foregoing covenants is independent of any other covenant or provision of this Guaranty or the Franchise Agreement. If all or any portion of the covenants in this Section is held to be unenforceable or unreasonable by any court or arbitrator, then the parties intend that the court or arbitrator modify such restriction to the extent reasonably necessary to protect the legitimate business interests of DonutNV Franchising. Guarantor agrees that the existence of any claim it or Franchisee may have against DonutNV Franchising shall not constitute a defense to the enforcement by DonutNV Franchising of the covenants of this Section. If Guarantor fails to comply with the obligations under this Section during the restrictive period, then the restrictive period will be extended an additional day for each day of noncompliance.

4.      **Modification.** Guarantor agrees that Guarantor's liability hereunder shall not be diminished, relieved or otherwise affected by (a) any amendment of the Franchise Agreement, (b) any extension of time, credit or other indulgence which DonutNV Franchising may from time to time grant to Franchisee or to any other person or entity, or (c) the acceptance of any partial payment or performance or the compromise or release of any claims.

5.      **Governing Law; Dispute Resolution.** This Guaranty shall be governed by and construed in accordance with the laws of the State of Florida (without giving effect to its principles of conflicts of law). The parties agree that any Florida law for the protection of franchisees or business opportunity purchasers will not apply unless its jurisdictional requirements are met independently without reference to this Section 5. The provisions of Article 17 (Dispute Resolution) of the Franchise Agreement apply to and are incorporated into this Guaranty as if fully set forth herein. Guarantor shall pay to DonutNV Franchising all costs incurred by DonutNV Franchising (including reasonable attorney fees) in enforcing this Guaranty. If multiple Guarantors sign this Guaranty, each will have joint and several liability.

DonutNV Franchise Agreement

Agreed to by:


Name: _____

Address: _____

_____

Date: _____



Name: _____

Address: _____

_____

Date: _____



Name: _____

Address: _____

_____

Date: _____

38

DocuSign Envelope ID: FF9DDC23-85E5-404B-B36D-BC73AF046434

## Attachment 3 to the Franchise Agreement

Territory #1:



| ZIP Code | ZIP Code Name | Total Population |
|---|---|---|
| 80904 | COLORADO SPRINGS | 21,102 |
| 80907 | COLORADO SPRINGS | 28,823 |
| 80909 | COLORADO SPRINGS | 37,659 |
| 80919 | COLORADO SPRINGS | 29,833 |
| Total: | | 117,417 |

39

DonutNV Franchise Agreement

Territory #2:



| ZIP Code | ZIP Code Name | Total Population |
|----------|---------------|------------------|
| 80903 | COLORADO SPRINGS | 15,696 |
| 80910 | COLORADO SPRINGS | 30,245 |
| 80914 | COLORADO SPRINGS | 862 |
| 80915 | COLORADO SPRINGS | 22,290 |
| 80916 | COLORADO SPRINGS | 37,597 |
| Total: | | 106,690 |

DonutNV Franchise Agreement

**DEVELOPMENT RIGHTS RIDER**

This Development Rights Rider (this "Rider") amends the Franchise Agreement dated
_12/23/2022 | 7:31 PST_ (the "Agreement"), between DonutNV Franchising, Inc., a
Pennsylvania corporation ("DonutNV Franchising") and Matthew S. Furman, an individual in
Colorado ("Franchisee").

**1.     Multi-Unit Commitment.** Franchisee shall execute additional DonutNV franchise
agreements to develop and operate additional Units on the following schedule (the
"Development Schedule"):

| Unit # | Territory | Deadline for Signing Franchise Agreement and Ordering Unit | Deadline for Opening |
|--------|-----------|-----------------------------------------------------------|----------------------|
| 2 | Colorado Springs, CO 3 & Colorado Springs, CO 2 | FA signed 12 months after unit 1 opens. Deposit on the trailer is paid at the same time as the FA is executed. | 18 months from grand opening of trailer #1. |

**2.     Fee and Payment.** For all territories (including the first territory under the attached
Franchise Agreement), Franchisee shall pay the total initial franchise fee to DonutNV
Franchising equal to $85,603.00. The total initial franchise fee is not refundable under any
circumstances (even if Franchisee does not execute any of the future franchise agreements).

**3.     Form of Agreement.** For each additional DonutNV franchise, Franchisee shall execute
DonutNV Franchising's then-current standard form of franchise agreement prior to ordering a
Unit for the additional territory. However, the franchise agreement will be modified so that the
royalty fees and brand fund contribution as in their first franchise agreement (specifically, a
Royalty Fees of $125 per week in Year 1 of the new franchise agreement, $136 per week in Year
2, and $146 per week through the end of the term, and Brand Fund Contribution of $200 per
month (subject to the inflation adjustment)).

**4.     Operation in Multiple Territories.** So long as Franchisee complies with the
Development Schedule, Franchisee may operate each Unit in any of the Territories described in
the Development Schedule. If Franchisee fails to fulfill the Development Schedule, then
DonutNV Franchising may at any time thereafter reduce, alter, or eliminate any one or more
Territories by giving notice thereof to Franchisee.

**5.     Termination of Development Rights.**

     (a)     Automatic. This Rider will automatically terminate if the Franchise Agreement to
which it is a part is terminated for any reason.

     (b)     By DonutNV Franchising. DonutNV Franchising may terminate Franchisee's
development rights under this Rider by giving notice to Franchisee, without opportunity to cure,
if any of the following occur:

1

DonutNV Development Rights Rider

(i) Franchisee fails to satisfy the development schedule;

(ii) Franchisee informs DonutNV Franchising that it will not fulfill the development schedule; or

(iii) DonutNV Franchising has the right to terminate any other franchise agreement between DonutNV Franchising and Franchisee due to Franchisee's default thereunder (whether or not DonutNV Franchising actually terminates such franchise agreement).

(c) <u>By Franchisee</u>. Franchisee may terminate this Rider at any time. Franchisee will not receive a refund of any franchise fees.

**6.    Transferability.** Franchisee may execute the future franchise agreements through a wholly-owned entity formed for the purpose of operating the Business. Otherwise, Franchisee does not have the right to Transfer development rights hereunder to any other person or entity without the approval of DonutNV Franchising in accordance with the Franchise Agreement. Any attempt by Franchisee to Transfer development rights to another person or entity without such approval will be void.

**7.    Limitation of Franchisee's Liability.** Franchisee's commitment to develop DonutNV Units under this Rider is in the nature of an option only. If Franchisee's development rights under this Rider are terminated for any reason, Franchisee shall not be liable to DonutNV Franchising for lost future revenues or profits from the unopened future DonutNV Units.

[*Signatures on next page*]

2

DonutNV Development Rights Rider

Agreed to by:

FRANCHISOR:

DONUTNV FRANCHISING, INC.

By: _Alex Gingold_____
    83D0C85CE3E7452...
Name: Alex Gingold
Title: Co-Founder, CEO & Donut Connoisseur
Date: 12/23/2022 | 7:31 PST


FRANCHISEE:

MATTHEW S. FURMAN

By: _Matt Furman_____
    2C93436D582F437...
Name: Matthew S. Furman, individually
Date: 12/15/2022 | 2:21 PST

DonutNV Development Rights Rider

Territory #1:



| ZIP Code | ZIP Code Name | Total Population |
|---|---|---|
| 80904 | COLORADO SPRINGS | 21,102 |
| 80907 | COLORADO SPRINGS | 28,823 |
| 80909 | COLORADO SPRINGS | 37,659 |
| 80919 | COLORADO SPRINGS | 29,833 |
| Total: | | 117,417 |

DonutNV Development Rights Rider

DocuSign Envelope ID: FF8DDC23-85E5-404B-B36D-BC73AF046434

Territory #2:



| ZIP Code | ZIP Code Name | Total Population |
|----------|---------------|------------------|
| 80903 | COLORADO SPRINGS | 15,696 |
| 80910 | COLORADO SPRINGS | 30,245 |
| 80914 | COLORADO SPRINGS | 862 |
| 80915 | COLORADO SPRINGS | 22,290 |
| 80916 | COLORADO SPRINGS | 37,597 |
| Total: | | 106,690 |

5

DonutNV Development Rights Rider

**DonutNV – Language for Payment of Franchisee Upon Completing Rollover**

Date: _12/23/2022 | 7:31 PST_____

**[1].** **Payment of Initial Franchise Fee.** Notwithstanding Section 4.2 of the Agreement, Franchisee shall pay the initial franchise fee as follows:

(i)      $59,500.00 of the initial franchise fee upon executing the Agreement; and

(ii)      $26,103.00 upon the first to occur of (A) $85,603.00 completes a Rollover as Business Startup (ROBS 401(k)) business financing, or (B) $26,103.00 remaining due on January 31, 2023.

If Franchisee fails to make timely payment of the initial franchise fee, such failure will be an event of default subject to Section 14.2(a).

**[2].** **No Guaranty by Corporate Owner.** So long as Franchisee is owned by a 401(k) retirement plan, by DonutNV Franchising will not require such owner to execute a Guaranty of the Agreement.

FRANCHISOR:

DONUTNV FRANCHISING, INC.

By: _Alex Gingold_____
     83D0C85CE3E7452...
Name: Alex Gingold
Title: Co-Founder, CEO & Donut Connoisseur
Date: _12/23/2022 | 7:31 PST_____

FRANCHISEE:

MATTHEW S. FURMAN

By: _Matt Furman_____
     2C93436D582F437...
Name: Matthew S. Furman, individually
Date: _12/21/2022 | 3:20 PST_____

**DocuSign**

## Certificate Of Completion

Envelope Id: FF9DDC2385E5404BB36DBC73AF046434
Subject: DonutNV 2022 Franchise Agreement & Development Rights Rider - Furman
Source Envelope:
Document Pages: 47
Certificate Pages: 6
AutoNav: Enabled
EnvelopeId Stamping: Enabled
Time Zone: (UTC-08:00) Pacific Time (US & Canada)

Signatures: 6
Initials: 6

Status: Completed

Envelope Originator:
Amie Hawk
16934 Frances Street
Suite 105
Omaha, NE  68130
ahawk@franchisefastlane.com
IP Address: 74.126.62.225

## Record Tracking

Status: Original
　　　12/12/2022 12:50:59 PM

Holder: Amie Hawk
　　　ahawk@franchisefastlane.com

Location: DocuSign

| Signer Events | Signature | Timestamp |
|---|---|---|
| ███████ ████████████ ██ ███████████████ | Matt Furman — DocuSigned by — 2C93436D582F437… | ████████████████ ████████████ ███████████ ██████████ |
| ███████████ ████████████ ████████████████ | | |
| █████████ ████████████ ██ ███████████████ | Matt Furman — DocuSigned by — 2C93436D582F437… | █████████████ █████████████ █████████████ █████████████ |
| █████████████ █████████████ | | |
| █████████ ██████████████ ██ ████████████ ████ ██ ██ | Alex Gingold — DocuSigned by — 83D0C85CE3E7452… | █████████████ █████████████ █████████████ █████████████ |
| ████████████████ ████████████████ | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
| --- | --- | --- |

| Carbon Copy Events | Status | Timestamp |
| --- | --- | --- |



█████ Authentication
(None)

**Electronic Record and Signature Disclosure:**
  Not Offered via DocuSign

Sent: 12/23/2022 9:31:21 AM

| Witness Events | Signature | Timestamp |
| --- | --- | --- |

| Notary Events | Signature | Timestamp |
| --- | --- | --- |

| Envelope Summary Events | Status | Timestamps |
| --- | --- | --- |
| Envelope Sent | Hashed/Encrypted | 12/12/2022 12:51:08 PM |
| Envelope Updated | Security Checked | 12/20/2022 2:21:28 PM |
| Envelope Updated | Security Checked | 12/20/2022 2:21:28 PM |

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Updated | Security Checked | 12/20/2022 2:21:28 PM |
| Certified Delivered | Security Checked | 12/22/2022 9:48:55 AM |
| Signing Complete | Security Checked | 12/23/2022 9:31:16 AM |
| Completed | Security Checked | 12/23/2022 9:31:21 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

Electronic Record and Signature Disclosure created on: 4/4/2019 11:28:41 AM
Parties agreed to: Matt Furman, Matt Furman, Alex Gingold, Jen Cain

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, Franchise FastLane (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

### Getting paper copies

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

### Withdrawing your consent

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

### Consequences of changing your mind

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

### All notices and disclosures will be sent to you electronically

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Franchise FastLane:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: ahawk@franchisefastlane.com

**To advise Franchise FastLane of your new email address**

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at ahawk@franchisefastlane.com and in the body of such request you must state: your previous email address, your new email address.  We do not require any other information from you to change your email address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

**To request paper copies from Franchise FastLane**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email to ahawk@franchisefastlane.com and in the body of such request you must state your email address, full name, mailing address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Franchise FastLane**

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to ahawk@franchisefastlane.com and in the body of such request you must state your email, full name, mailing address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.

**Acknowledging your access and consent to receive and sign documents electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures', you confirm that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
- Until or unless you notify Franchise FastLane as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by Franchise FastLane during the course of your relationship with Franchise FastLane.